IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BRIAN JOHNATHAN FLINT,<br><br>Defendant. | ORDER<br>and<br>MEMORANDUM DECISION<br><br><br>Case No. 1:11-CR-20-TC |

Brian Flint was indicted and charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and possession of methamphetamine, in violation of 22 U.S.C. § 844(a). Mr. Flint has moved to suppress all evidence obtained during the January 29, 2011, detention and search of his person. Mr. Flint contends that the evidence should be suppressed because it was obtained in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. For the reasons set forth below, Mr. Flint's motion is DENIED.

**FINDINGS OF FACT**

On January 29, 2011, Clearfield, Utah Police Officer Jason Richards[1] was dispatched to

---

[1] Officer Richards had been employed by the Clearfield Police Department for a little over one year. During that year, Officer Richards "had the opportunity to come into contact many meth users." (Tr. at 19:10-12.) Before working for the Clearfield Police Department, Officer Richards was a police officer in Palm Beach County, Florida, for eight years. While

Star Pawn Inc. (Star Pawn) in response to a theft in progress call. Ulises Garcia, the son of Star Pawn's owner and the employee who managed the front of the store, had called to report the theft.

Mr. Garcia told dispatch that there were three men in the store and one of them, a five-foot-ten white man with brownish-blonde hair wearing a grey and white hoodie with skulls on it, was in the process of stealing a camcorder. According to Mr. Garcia, his younger brother, Abraham Sanchez, Jr., who was also an employee of Star Pawn, had seen Mr. Flint reach into the back of one of Star Pawn's glass showcases, take a camcorder from the case, and place it in his pocket. Mr. Garcia verified that a camcorder was in fact missing from the showcase. Both he and Mr. Sanchez had seen Mr. Flint pull the camcorder out of his pocket, show it to his friend, and then return it to his pocket. Mr. Garcia reported that Mr. Flint was still inside the store. This information was relayed to Officer Richards.

When Officer Richards arrived at Star Pawn, Mr. Garcia met him outside the store. Mr. Garcia told Officer Richards that his brother, Mr. Sanchez, had seen someone stealing from the store. Mr. Garcia and Officer Richards then entered the store together, and Mr. Garcia pointed out Mr. Flint as the person who had taken the camcorder.

Mr. Flint's physical characteristics and clothing matched the description of the suspect that Officer Richards had received from dispatch. Mr. Flint was standing in the back corner of the store with no one else around him. As Officer Richards walked toward Mr. Flint, he saw Mr. Flint holding a camcorder in his hands. Officer Richards asked Mr. Flint, "hey man, is that

---

working in Florida, Officer Richards came into contact with drugs nearly every shift.

yours?" (Tr. at 17:2-3.) Mr. Flint responded that he was "looking for an accessory, battery or cable." (Id.) Officer Richards described Mr. Flint's behavior as "acting nervous":

> he was fidgeting with the camcorder in his hands. He was standing in the same position, not walking around, but he continued to shift his weight back and forth on his feet. And while I was speaking with him, instead of having eye contact with me and having a conversation with me, he was looking all over the place around the store.

(Tr. at 17:10-16.) Officer Richards also noticed that Mr. Flint was sweating, which struck him as unusual because it was January and the store was a moderate temperature. Mr. Garcia, who was watching the conversation from a short distance away, described Mr. Flint as "a little jumpy and defensive" and "just kind of acting weird." (Tr. at 56:3-4, 10-11.)

Based on Mr. Flint's initial response and his demeanor, Officer Richards believed "there was going to be a flight, there was going to be a fight, that something wasn't right." (Tr. at 21:17-19.) Officer Richards grabbed Mr. Flint's right arm and "asked him if he had identification and not to go for it, not to move and to just stay calm." (Tr. at 41:3-5.) Officer Richards then asked Mr. Flint to turn and put his hands on the shelf. As Mr. Flint turned, he turned away from Officer Richards and tried to pull his arm free and run for the exit. Mr. Flint was unsuccessful because Officer Richards still had hold of his arm. Mr. Flint then began to struggle and attempted to reach for his waistband. Officer Richards and a Deputy Sheriff who had arrived on the scene restrained Mr. Flint. While doing so, Officer Richards punched Mr. Flint a few times to keep his hands away from his waistband. A loaded magazine fell out of Mr. Flint's pocket during the struggle. Once Mr. Flint was secured, Officer Richards placed him under arrest.

## CONCLUSIONS OF LAW

Mr. Flint contends that the physical evidence should be suppressed because Officer

Richards did not have reasonable suspicion to justify the seizure of Mr. Flint.

A.  **Officer Richards had reasonable suspicion to justify the seizure.**

Mr. Flint was seized when Officer Richards grabbed his arm, told him not to move, and asked for identification. See Florida v. Bostick, 501 U.S. 429, 437 (1991) (A seizure of the person within the meaning of the Fourth Amendment occurs when "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988))). The question then is whether Officer Richards had a reasonable, articulable suspicion that Mr. Flint was engaged in criminal activity. See Terry v. Ohio, 392 U.S. 1, 21 (1968). Given the totality of the circumstances, the court finds that Officer Richards did.

"While the Court has recognized in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980). When making a reasonable suspicion determination, the court "must look at the 'totality of the circumstances' . . . to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273 (quoting Cortez, 449 U.S. at 418). And reviewing courts "accord appropriate deference to

the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." United States v. Alvarez, 68 F.3d 1242, 1244 (10th Cir. 1995) (citing United States v. Lopez-Martinez, 24 F.3d 1481, 1484 (10th Cir. 1994)).

Although "[a]nonymous tips raise difficult Fourth Amendment questions," "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." United States v. Robinson, 304 F. App'x 746, 750 (10th Cir. 2008) (internal citations omitted).

> The inquiry is case-specific, but relevant factors include: (1) whether the informant lacked "true anonymity" (i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, first-hand knowledge; (3) the informant's stated motivation for reporting the information; and (4) whether the police were able to corroborate information provided by the informant.

Id. (citing United States v. Brown, 496 F.3d 1070, 1079 (10th Cir. 2007)).

Here, Officer Richards had reasonable suspicion that Mr. Flint was engaged in criminal activity based on the information he obtained through dispatch from Mr. Garcia's 911 call and his observation of Mr. Flint in Star Pawn. First, Mr. Garcia was not anonymous—Officer Richards was told by dispatch that he was the son of Star Pawn's owner and upon arriving at Star Pawn Officer Richards met briefly with Mr. Garcia. Second, Mr. Garcia reported contemporaneous first- and second-hand knowledge. While on the phone with dispatch, Mr. Garcia described Mr. Flint and his behavior in the store. Mr. Garcia also reported, based on information from his brother, Mr. Sanchez, that Mr. Flint had been seen reaching into the showcase and taking a camcorder. Third, Mr. Garcia's motive in making the call, as is apparent from listening to the tape of the 911 call, was to prevent a theft from the store where he worked

and that his father owned. Finally, Officer Richards was able to corroborate much of the information provided by Mr. Garcia. In particular, Mr. Garcia reported that a five-foot-ten white man wearing a grey and white hoodie with skulls on it had taken a camcorder from the store's showcase. Mr. Garcia pointed Officer Richards to Mr. Flint who matched the description Mr. Garcia had given. Upon approaching Mr. Flint, Officer Richards saw that he was holding a camcorder. Moreover, when Officer Richards began talking to Mr. Flint, Mr. Flint appeared to be nervous and possibly under the influence of drugs.

Based on the totality of the circumstances, Officer Richards had reasonable suspicion that Mr. Flint was engaged in criminal activity. Accordingly, the initial seizure of Mr. Flint—when Officer Richards grabbed Mr. Flint's arm—was justified at its inception.

### B. The seizure of Mr. Flint did not exceed the scope of its justification.

Once it is determined that a seizure was justified at its inception, the question becomes "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20.

Officer Richards's actions were reasonably related in scope to the circumstances justifying his investigative stop of Mr. Flint. After approaching Mr. Flint, Officer Richards grabbed Mr. Flint's arm in an effort to detain and question Mr. Flint and because of Officer Richards's justified concerns about his own safety. Officer Richards believed, based on Mr. Flint's behavior, that Mr. Flint was going to either flee or fight. Officer Richards's grabbing of Mr. Flint's arm was a minor application of force and lasted only a few moments. Accordingly, the seizure of Mr. Flint did not exceed the scope of its justification. See Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1030 (10th Cir. 1997) (holding that officer's three-times

grabbing of defendant's arm was a valid <u>Terry</u> stop that did not exceed the scope of its justification).

C. **Once Mr. Flint attempted to flee and fought, Officer Richards had probable cause to arrest Mr. Flint.**

Having found that Officer Richards's seizure of Mr. Flint was justified as an investigative detention under <u>Terry</u>, the court must next look to the portion of the encounter where Officer Richards engaged in a struggle with and subdued Mr. Flint. "[A]t this point the encounter exceeded the parameters of an investigative detention and constituted an arrest." <u>United States v. Morgan</u>, 936 F.2d 1561, 1568 (10th Cir. 1991). The question then is whether Officer Richards, at the time of the arrest, possessed the requisite probable cause to make the arrest without a warrant.

After Officer Richards seized Mr. Flint by grabbing his arm, Officer Richards asked Mr. Flint if he had any identification but told him not to reach for it. Officer Richards then told Mr. Flint to turn around and place his hands on a nearby shelf. As Mr. Flint turned away from Officer Richards, Mr. Flint tried to pull his arm free and run for the exit. A struggle then ensued between Mr. Flint and Officer Richards and the Deputy Sheriff on the scene. During the struggle, Mr. Flint repeatedly reached for his waistband. Ultimately, Officer Richards secured Mr. Flint and placed him under arrest.

Having held that Officer Richards had the necessary reasonable suspicion to conduct the initial investigative stop and seizure, the court finds that the totality of the circumstances—the facts establishing Officer Richards's reasonable suspicion combined with Mr. Flint's actions, including his attempted flight and resistance—gave Officer Richards probable cause to arrest Mr.

Flint. See Morgan, 936 F.2d at 1569 (finding probable cause to arrest when defendant, after a justified Terry stop, ran from the officer, ignored the officer's command to get on the ground, and struggled with the officer); see also Kolender v. Lawson, 461 U.S. 352, 366 n.4 (1983) (Brennan, J., concurring) ("[S]ome reactions by individuals to a properly limited Terry encounter, . . . such as flight, may often provide the necessary information, in addition to that which the officers already possess, to constitute probable cause."); United States v. Bell, 892 F.2d 959, 967 (10th Cir. 1989) (finding, after holding the officer had reasonable suspicion of criminal activity, that defendant's actions of dropping his bag and running provided the additional grounds for probable cause). Accordingly, Officer Richards's warrantless arrest of Mr. Flint was lawful.

## CONCLUSION

For the foregoing reasons, Mr. Flint's Motion to Suppress (Dkt. No. 18) is DENIED.

SO ORDERED this 8th day of December, 2011.

BY THE COURT:

_____
TENA CAMPBELL
United States District Judge